[Cite as *In re H.S.*, 2022-Ohio-506.]

IN THE COURT OF APPEALS OF OHIO

TENING APPELLATE DISTRICT

| In the Matter of: | : | No. 21AP-190 |
| [H.S. et al., | : | (C.P.C. No. 18JU-14452) |
| K.G., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

| In the Matter of: | : | No. 21AP-191 |
| [A.G., | : | (C.P.C. No. 19JU-10151) |
| K.G., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

| In the Matter of: | : | No. 21AP-201 |
| [A.G., | : | (C.P.C. No. 19JU-10151) |
| P.S., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

| In the Matter of: | : | No. 21AP-202 |
| [H.S. et al., | : | (C.P.C. No. 18JU-14452) |
| P.S., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on February 22, 2022

**On brief**: *William T. Cramer*, for appellant K.G.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann,* for appellant P.S.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1}    Appellants, K.G. and P.S., appeal the April 8, 2021 decisions and judgment entries of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating their parental rights and granting permanent custody of minor children H.S., M.S., A.S., R.S., and A.G. ("children") to appellee, Franklin County Children Services ("FCCS").

{¶ 2}    For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 3}    K.G. and P.S. are the mother and father, respectively, of the five children at issue in this case, H.S. (D.O.B. Oct. 23, 2009), M.S. (D.O.B. Apr. 17, 2014), A.S. (D.O.B. May 11, 2016), R.S. (D.O.B. Oct. 23, 2017), and A.G. (D.O.B. June 22, 2019).

{¶ 4}    On December 13, 2018, a complaint was filed against appellants alleging neglect of the four oldest children under R.C. 2151.03(A)(2) and dependency under R.C. 2151.04(C).  According to the complaint, FCCS received a report that law enforcement had been dispatched to a home for a possible overdose where P.S. was found unconscious.  Law enforcement reportedly observed a syringe and digital scale on a dresser in plain sight as well as five additional syringes, four of which were uncapped, in the room where M.S. was sleeping.  A cigarette pack was found with a powder substance subsequently identified as methamphetamine.  It was later determined that law enforcement had previously come to the home for overdoses on prior occasions.  An emergency custody order was granted that same day.  On December 14, 2018, a temporary order of custody was issued to FCCS, and the parents were ordered to make contact with the Family Recovery Court Program ("Recovery Court").  The parents were permitted supervised visitation of the children and ordered to complete drug and alcohol assessments as well as comply with random drug screens.

{¶ 5}    On January 28, 2019, the maternal grandmother, M.G., filed motions to be added as a party and for legal custody of the children.  On February 1, 2019, the magistrate denied the motion as the maternal grandmother was not a party and had no standing at that time.

{¶ 6}   On February 20, 2019, the parties participated in an adjudicatory hearing with the magistrate on the neglect and dependency causes of action. FCCS agreed to dismiss the neglect claim, and the children were then adjudicated as dependent pursuant to R.C. 2151.04(C). The magistrate's decision was adopted by the trial court on March 5, 2019.

{¶ 7}   On June 22, 2019, K.G. gave birth to A.G. On August 30, 2019, FCCS filed a complaint for causes of action alleging A.G. was abused, neglected, and dependent. Both K.G. and A.G. tested positive for amphetamines during the birth. K.G. admitted that she did not receive prenatal care and did not reveal her pregnancy to her medical provider. A temporary order of custody was issued to FCCS on September 3, 2019.

{¶ 8}   On October 7 and 9, 2019, K.G. and P.S. respectively signed an agreed order to participate in Recovery Court. The parents were ordered to "[c]omply with rules and regulations of Family Recovery Court, [c]omply with treatment through Ohio Guidestone," attend community support meetings, submit to random urine screens, and abstain from mood altering substances. (Oct. 9, 2019 Mag. Decision & Entry; October 15, 2019 Mag. Decision & Entry.) The trial court approved and adopted the orders on October 30, 2019.

{¶ 9}   On November 15, 2019, the trial court held an adjudicatory hearing for A.G. The trial court found A.G. abused as defined in R.C. 2151.03(D), neglected as defined in R.C. 2151.03(A)(2), and dependent as defined in R.C. 2151.04(C). The trial court ordered A.G. a ward of the court and committed said child temporarily to the custody of FCCS.

{¶ 10} On October 29, 2019, FCCS filed a motion for permanent custody of H.S., M.S., A.S., and R.S. On June 29, 2020, FCCS filed a motion for permanent custody of A.G. A trial was set to begin in this matter on July 14, 2020. The parents appeared stating that they were positive for COVID-19. The case was continued until July 21, 2020. The trial court again continued the case this time at the request of the guardian ad litem based on a conflict at the time between her recommendation and H.S.'s wishes as to the motion for permanent custody. The case was continued to allow the guardian ad litem to retain counsel for H.S. based on the conflict of interest.

{¶ 11} The trial began on November 24, 2020, and continued over five days through February 2, 2021. The following evidence was adduced at trial.[1]

---

[1] Counsel for the parents made clear during opening statements that they were not asking for a return of the children but seeking an extension to show they are able to demonstrate stability in the home.

{¶ 12} P.S. and K.G. live in a four-bedroom home owned by the maternal grandmother in the Whitehall neighborhood. The parents have generally lived at the Whitehall home for approximately 15 years. P.S. stated that he has been with K.G. since 2006, and they last used drugs together sometime in 2020. The parents have five children with a sixth on the way. (Nov. 24, 2020 Tr. at 12.) P.S. is also the father of two teenage children not involved in this case. P.S. stated that he has received a copy of the case plan in this matter. P.S. testified his case plan includes regularly meeting with the caseworker, signing releases, alcohol and other drug ("AOD") assessment and to follow any recommendations, parenting classes, alcohol and drug counseling through Guidestone, and following the rules of Recovery Court. P.S. noted that diabetic services and regular drug screens are also part of his case plan. P.S. stated that he has suffered from bipolar depression since he was 13 years old and is seeking additional treatment.

{¶ 13} P.S. testified that he attempted suicide in November 2018 by trying to overdose on drugs. P.S. admitted that his use of drugs and addiction affects his mental health. P.S. acknowledged that he failed to complete drug screens from March to July 2020. P.S. noted that his drug of choice is speed, and he last used around 90 days ago. P.S. also acknowledged that he has not successfully completed treatment for alcohol or drug abuse during this case. P.S. went to an inpatient treatment in Portsmouth for 4 days and then left against medical advice. P.S. conceded that he has not provided records from Guidestone on his current treatment.

{¶ 14} In February 2019, P.S. was referred to Recovery Court but did not enroll in the program until October 2019. P.S. did not complete an outpatient program and missed meetings as well. P.S. also did not complete an inpatient program despite multiple orders. P.S. stated he missed some meetings because he was sick for a few days but did not notify them until afterwards. According to P.S., in February 2020, he was using 10 dollars a day on methamphetamines. Of the 211 tests offered, P.S. testified that he has had 4 negative tests and 25 positive tests. P.S. stated that the positive tests were all for amphetamines. P.S. was terminated from Recovery Court for noncompliance on July 10, 2020.

{¶ 15} P.S. is on disability and receives an income of about $700 per month. P.S. is attending parenting classes once a week but has not completed the program. P.S. testified that he visited regularly with his children and has only missed one or two meetings. During COVID-19, P.S. has participated in video calls with the children. P.S. conceded he has never

had in-home visits or unsupervised visits with the children. M.S. is six years old, autistic, and on medication. P.S. is not sure of the name of the medication. H.S. has asthma and R.S. is on medication for allergies. P.S. acknowledged that H.S., A.S., and R.S. are in counseling for post-traumatic stress disorder ("PTSD") arising from this case.

{¶ 16} P.S. testified his longest period of sobriety was from 2009 until 2018. From 2018 to present day, his longest period of sobriety has been 90 days. According to P.S., his concern for COVID-19 is elevated because he is diabetic and suffers from other health ailments. P.S. stated that COVID-19 was an impediment to screening but conceded that it was not an impediment to purchasing methamphetamine. While P.S. also noted his concern with getting COVID-19 was a reason for missing drug screens, he acknowledged that it was not an issue from 2018 to 2020. While P.S. cited transportation as another impediment to screening, he conceded that K.G. has a car, and he was provided gas cards. P.S. noted that the vehicle has had some mechanical issues over this time. P.S. testified that he signed the releases and regularly checked in with his case worker. P.S. is seeking treatment for his diabetes, has a mental health and family counselor, and is frequently attending group meetings.

{¶ 17} Regarding the inpatient program in Portsmouth, it was a seven-day detox program, which he left after four days. P.S. later conceded that his disability income is not contingent on whether he is in an inpatient treatment facility or not. P.S. stated that health insurance has been a barrier to inpatient treatment, but he has health insurance coverage now that could cover inpatient treatment.

{¶ 18} K.G. testified that she is the mother of the five children at issue in this case. K.G. received the case plan that included completing an AOD assessment, drug court, regularly meeting with the caseworker, sign releases, and parenting classes. K.G. testified she did not meet once a month with her case caseworker. K.G. acknowledged that she has a drug problem. K.G. testified her drug of choice is fentanyl but she has also tested positive for methamphetamine, ecstasy, and opiates during this case. K.G. stated her last date of use was approximately 21 days ago. K.G. has not completed inpatient treatment for drug and alcohol abuse but did attend four days of the seven-day inpatient program with P.S. K.G. testified she has participated in outpatient treatment and has a prescription for Suboxone. K.G. started her ongoing supportive services program at Grant Family Practice for Suboxone in December 2018. The program also includes two-hour group therapy

sessions, which she has attended on and off since 2018. The classes shut down in March 2020.

{¶ 19} K.G. testified that she is screened for drugs at Grant Family Practice but does not know the results. K.G. started attending Ohio Guidestone outpatient program in the fall 2019 but was terminated from the program for noncompliance. K.G. has been doing outpatient treatment with Columbus Springs for the last two weeks. The program is six hours of treatment per day that includes individual counseling and group sessions. The program tested her on the first day, but she does not know the results of the test. According to K.G., the parents have also attended Narcotics Anonymous ("NA") meetings and the Better Late Than Never program for three months. K.G. stated that since 2018, her longest period of sobriety was from July to August 2019. K.G. conceded that she has never successfully completed an inpatient or outpatient program.

{¶ 20} K.G. enrolled in Recovery Court in October 2019. K.G. is aware that she has been ordered to complete inpatient counseling through Recovery Court multiple times but has failed to complete the requisite treatment. K.G. failed to attend the required office visits and was later terminated unsuccessfully from Recovery Court on July 10, 2020.

{¶ 21} K.G. was offered around 213 drug screens and failed to appear for 189 of the tests. K.G. acknowledged that missed drug screens are considered positive. K.G. attributed the missed tests to being sick, depression, transportation, and parking issues. K.G. testified that she is now on medication for depression. K.G. has only completed 1 drug screen since January 2020.

{¶ 22} K.G. is unemployed and stated the family's only income is from P.S.'s disability check. K.G. has not sought employment in five years purportedly because of M.S.'s autism diagnosis. K.G. is enrolled in the parenting program at Guidestone but has not completed the course. K.G. testified she regularly attended visits with her children. K.G. stated that she finished a parenting course for special needs kids at St. Vincent's Community Center but acknowledged she never provided the certificate of completion.

{¶ 23} K.G. testified that she is currently 27 or 28 weeks pregnant. K.G. sees a specialist for maternal fetal medicine and has gone to all her baby appointments. K.G. used fentanyl while pregnant with A.G., but she says she did not know she was pregnant until 20 weeks. K.G. estimated that she used fentanyl between 10 to 15 times during her last pregnancy. Before the most recent use of fentanyl 21 days ago, K.G. stated that her last use

was October 2020. K.G. admitted to using fentanyl each month from June through November 2020. K.G. testified that since she found out she was pregnant she has used at least three times. The last time K.G. and P.S. used methamphetamine together was six months ago. K.G. stated her desired outcome of the case was to allow her more time to prove her sobriety. K.G. acknowledged that she has had a case plan in place to prove her sobriety since February 2019. K.G. conceded that she has used fentanyl from August through November of that year, the period after the motion for permanent custody was filed in this case. K.G testified that she has learned better coping mechanisms and how to handle triggers during her treatment. K.G. recognized that drug use impedes her ability to care for her children.

{¶ 24} Cyndi Vancleve testified that she has been the Program Director of the Family Recovery Court in the Juvenile Court for the last four years. (Dec. 2, 2020 Tr. at 6.) Vancleve is a licensed independent social worker and has attended multiple specialized docket trainings over the past five years. Vancleve testified that as part of her job duties she generally attends Recovery Court as well as annual reviews. Vancleve testified that Recovery Court is voluntary and any referrals to the program are in consultation with an attorney. Any documentation is reviewed by the participant with an attorney prior to entering the program.

{¶ 25} According to Vancleve, the parents entered Recovery Court on October 7, 2019. Vancleve stated that the parents were assessed and determined to initially need outpatient treatment. Vancleve testified that it was a struggle for P.S. and K.G. to attend various groups and treatment. In December 2019, their assessment of the parents changed to an inpatient treatment recommendation when they received a significant number of positive tests for fentanyl. On February 14, 2020, K.G. attempted to complete a detox program called Foundations but left the next day. K.G. and P.S. went again later that month and stayed until March 2nd before leaving against medical advice. Vancleve testified as to how Recovery Court adapted its services during the pandemic by providing kits for virtual screening. Vancleve noted the parents did not pick up their oral swabs from American Court Services ("ACS") for the virtual oral testing. Vancleve stated she has no reason to believe that the parents did not receive information on the virtual screens based on the text messages they exchanged throughout that period. Vancleve testified as to her desire for the

parents to participate in inpatient treatment separately as their co-dependency impeded their individual recovery.

{¶ 26} Vancleve could not recall the number of tests offered to K.G. but testified that K.G. never had a negative test during her time in the program. The tests were either missed or positive. P.S. missed less screens and had a couple negative tests in December 2019. According to Vancleve, P.S. was good at attending Recovery Court hearings from April to June but inconsistent with group meetings. At one point, K.G. stopped appearing in court, which resulted in a warrant being issued for failure to appear. Vancleve described the parents' compliance with drug screens for Recovery Court as "very minimal." (Dec. 2, 2020 Tr. at 21.) The parents' attendance at office visits was characterized as hit or miss. According to Vancleve, the parents did not provide goodbye letters to the Recovery Court. The motion to terminate the parents from Recovery Court was set for a hearing on July 10, 2020. The parents appeared at the hearing. The parents were ultimately terminated unsuccessfully from Recovery Court in July 2020. Vancleve stated that neither parent has demonstrated a pattern of sobriety. Vancleve explained that Recovery Court considers any missed tests as a positive screen. So, if P.S. tested positive 25 times and missed 182 screens, he is deemed to have had 207 positive tests. Similarly, if K.G. had 21 positive tests and missed 189 tests, she was deemed to have had 210 positive screens.

{¶ 27} Rae Damron testified that she has been the ongoing caseworker for the parents with FCCS since 2018. Damron stated that she wrote the case plan for the parents as part of her job responsibilities. According to Damron, the case came to their attention when there was suspected drug use in the home. It was reported that P.S. overdosed twice in November 2018. Damron stated that drug paraphernalia was found in the room of M.S. when he was sleeping. The emergency custody order ("ECO") was filed December 13, 2018. The children have been in the custody of FCCS continuously since that time. A.G. came into their care after he tested positive for amphetamines and Suboxone at birth. An ECO was filed for A.G. on August 30, 2019. The temporary order of custody was issued on September 3, 2019. A.G. was adjudicated an abused, neglected, dependent child on November 15, 2019.

{¶ 28} According to Damron, when the children first came into custody, they stayed with their maternal grandmother, M.G., and the parents left to stay with K.G.'s father. The grandmother requested the children be placed in foster care after one month. Damron

testified that H.S. and A.S. were set to be moved from their current foster to live with their paternal grandmother, M.K.W., in Atlanta, Georgia that December. Regarding M.S., Damron testified that he has special needs and has had two foster placements. The current placement would potentially be willing to adopt. R.S. has had one placement, but it is not in a potentially adoptive home. A.G. has had one foster parent in a possible adoptive home.

{¶ 29} Damron testified that she went over the case plans with K.G. and P.S. on multiple occasions noting reunification was the goal. Damron stated that she believes both parents understand the case plan. Damron testified, "[FCCS] offer[s] resources for the objectives such as resource cards like AOD, alcohol and drug like treatment places, mental health treatment places, places that they could do parenting and then we also assist with transportation services, if needed." (Dec. 2, 2020 Tr. at 70.) The case plan objectives were to maintain sobriety, complete alcohol and drug assessment and follow up recommendations, participate in Recovery Court, and follow those recommendations, parenting classes, sign releases, meet regularly, participate in random drug screens and to call ACS for those screens. P.S. has added objectives to address his diabetes and mental health treatment.

{¶ 30} Regarding the parents' compliance with the case plan, Damron testified that they both signed the releases. Damron stated that she considered this partially completed as P.S. never provided any documentation from his diabetes doctors. Damron believes that K.G.'s testimony was inaccurate as she had regular contact with K.G. by telephone and text message. Damron also testified that she meets with the parents during their visits with the children or visited with them regularly. Damron stated the longest period she went without contact with the parents was four weeks.[2]

{¶ 31} Damron testified that H.S. and A.S. were placed with their paternal grandmother in Atlanta since the last court date. (Jan. 4, 2021 Tr. at 8.) As to the parents' compliance with their case plans, they were provided referrals for alcohol and drug

---

[2] The trial was continued at this point in Damron's testimony to accommodate K.G., pregnant during the trial, for purported medical reasons. The parties reconvened on January 4, 2021, and the parents did not initially appear for trial. Over the objection of the attorneys for the parents, the case was not continued at that point. The trial court noted that neither parent indicated to their attorneys or caseworker a reason for them to miss court that day. (Jan. 4, 2021 Tr. at 6.) The attorneys for the parents later received text messages that the parents were confused on the court date, and the trial was continued until the 25th. Prior to the start of the January 25 hearing, counsel informed the trial court that the parents had an exposure to COVID-19 and were in the parking garage in their vehicle. (Jan. 25, 2021 Tr. at 5.) Counsel requested that they participate by video in the hearing from the garage. The parents appeared by video in the hearing. The case was again continued to allow the parents to be present in the courtroom.

assessments. The parents were also provided referrals through Recovery Court. K.G. completed her drug assessment through Guidestone in April 2019. K.G. was diagnosed with amphetamine dependence and recommended intensive outpatient treatment, which she did not complete. K.G. was later recommended through Recovery Court for intensive inpatient treatment, which was also not completed. Damron testified that K.G. did not finish any type of AOD treatment during this case.

{¶ 32} Damron testified that P.S. completed his AOD assessment in April 2019 and was diagnosed with an amphetamine dependency. P.S. was also diagnosed with "[m]ajor depression" and PTSD. (Jan. 4, 2021 Tr. at 15.) P.S. was recommended for an intensive outpatient program for treatment. According to Damron, there were concerns about P.S.'s compliance with the Guidestone program as he did not attend groups consistently and was not completing drug screens. Damron testified that she was unable to get records from Guidestone on P.S.

{¶ 33} In February 2020, the parents enrolled in inpatient treatment at Stepping Stones. The parents both left the program early against medical advice. Damron testified that P.S. has not successfully completed a drug or alcohol program since the case opened. P.S. also started inpatient treatment at Foundations but left against medical advice.

{¶ 34} Neither P.S. nor K.G. picked up their kits for in-home drug screening. From March to July 2020, neither parent completed a screen. Both parents were terminated from Recovery Court in July 2020. K.G. has been offered over 200 drug screens, and she has missed around 190 tests with no negative screens. P.S. has been offered over 200 tests, and he has taken 28 with 4 negative screens.

{¶ 35} The parents were scheduled for a hair follicle test on November 24, 2020. The parents arrived too late in the day to complete the test, so it was rescheduled for the following day. Damron testified that she went to the parents' home to provide gas cards the next morning. According to Damron, she was granted access to the home by another resident. "So, I waited in the living room while she went to knock on [K.G.'s] bedroom door and have [K.G.] come out. * * * [K.G.] then proceeded to come out. [K.G.] was signing for the gas card and while [K.G.] was signing for the gas card, I noticed that [K.G.] in the right side of her hair had a syringe stuck in her hair." (Jan. 4, 2021 Tr. at 35.) Damron left after K.G. signed for the gas card. Damron testified that she is concerned about this observation since K.G. has previously stated that syringes in the home are a trigger for the parents.

{¶ 36}   In Damron's opinion, K.G. and P.S. have not completed the requirements of their case plans.  Damron received a letter that the parents were enrolled in a parenting course at St. Stephen's in February 2019 but never received a certificate that they completed the program.  Damron testified that, in her discussions with the parents, they did not indicate that they completed the parenting course.  Damron stated that the parents also have an obligation to provide her with evidence of completion of an activity, and she never received any type of notice of completion for the parenting program.  Damron testified that the parents' only income is the social security disability from P.S., and they have not indicated a plan for childcare.

{¶ 37}   The parents have only missed one visit throughout the entire case and have done additional visits for birthdays and special occasions under her supervision.  Damron described the visits as hectic but appropriate.  The parents have shown up late or left early.  K.G. would leave the visit to go to the van.  The maternal grandmother would consistently attend the visits prior to COVID-19.  Damron believes that the children are all bonded with their current placement providers.

{¶ 38}   Damron testified that the children are all in need of legally secure permanent placement and asked the court to grant permanent custody.  "It is our recommendation because throughout this case plan both parents have been given adequate time, support, resources for them to have sobriety and it doesn't appear [] there's any real effort [by] them put into their sobriety."  (Jan. 4, 2021 Tr. at 59.)  Damron does not believe there should be an extension of six months for A.G.'s case as there has not been adequate compliance on the case plan services at this time.  Damron stated that the parents were informed of the virtual testing and that she provided transportation assistance to the parents.  According to Damron, maternal grandmother has expressed no interest in custody of any of the children.

{¶ 39}   Bonnie Vangeloff testified that she is the guardian ad litem for all five children. (Feb. 2, 2021 Tr. at 15.)  Vangeloff, based on her own observations or discussion with the caseworker, believes the placement of the children is safe and appropriate.  Vangeloff testified that she has concerns about the children returning to live with the parents.  Vangeloff stated the children and parents have a strong relationship and if the parents had overcome their drug use, she would have loved to see them reunify with the children.

{¶ 40} Vangeloff testified that H.S. initially wanted to be with her parents but changed her mind through the course of the proceeding. H.S. is old enough to understand the proceedings and wishes to be with her grandmother and permanent custody to be granted. Vangeloff says that M.S. is six years old with autism, is non-verbal, and unable to express his wishes as to what he desires regarding custody. A.S., R.S., and A.G. are all under four. Vangeloff believes these children are too young to really grasp the nature of the custody proceeding. A.S. has verbalized that she wanted to be with her parents but stated during their last meeting that she was not sure. Vangeloff testified that she has reviewed the drug screens and Recovery Court records for the parents and would have concerns about the children returning to their care as she believes the parents have not overcome their drug addiction. Vangeloff believes additional time in A.G.'s case would not alleviate any of her concerns. Vangeloff stated that the children are in need of legally secure permanent placement and would recommend the permanent custody motion be granted. Vangeloff testified that whether the parents owned the Whitehall residence would not impact her recommendation on permanent custody.

{¶ 41} The juvenile court took the matter under advisement and allowed the parties to file written closing arguments. On April 8, 2021, the trial court issued decisions in both cases terminating the parental rights of appellants and granted FCCS permanent custody of the five children. The trial court analyzed the factors pursuant to R.C. 2151.414(D)(1) and found that there was clear and convincing evidence that granting FCCS's request for permanent custody was in the children's best interest. Under R.C. 2151.414(B)(1)(a), the trial court also found that there was clear and convincing evidence that the children could not be placed with either of the parents within a reasonable time or should not be placed with the children's parents.

{¶ 42} Appellants filed timely appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 43} K.G. submits the sole assignment of error:

> Appellant's Due Process rights were violated by a grant of permanent custody that was not supported by the weight of the evidence.

{¶ 44} P.S. submits the sole assignment of error:

> The juvenile court's judgment that permanent court commitment of the minor children to Franklin County

> Children Services was in the minor children's best interests under R.C. 2151.414(D)(1) is against the manifest weight of the evidence.

## III. STANDARD OF REVIEW

{¶ 45} A trial court's determination that it was in the best interest of the children to grant a motion for permanent custody will not be reversed by a reviewing court unless it is against the manifest weight of the evidence. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). In a permanent custody matter, the reviewing court " 'will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re B.B.,* 10th Dist. No. 20AP-488, 2021-Ohio-2299, ¶ 21, quoting *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 51. "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Citations omitted.) *In re R.P.*, 10th Dist. No. 20AP-538, 2021-Ohio-4065, ¶ 37. When reviewing a juvenile court's determination as to permanent custody, this court must make every reasonable presumption in favor of the trial court's findings of facts and judgment. *B.B.* at ¶ 21, quoting *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13. "Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered." *R.P.* at ¶ 36, citing *Eastley* at ¶ 20.

## IV. LEGAL ANALYSIS

### A. K.G.'s and P.S.'s Assignments of Error

{¶ 46} In K.G.'s sole assignment of error, she argues the trial court's judgment granting permanent custody was not supported by the weight of the evidence. In P.S.'s sole

assignment of error, he argues the juvenile court's judgment was against the manifest weight of the evidence. For harmony of analysis, we will address both parents' assignments of error together.

{¶ 47} The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution protect the fundamental right to parent one's child. *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). While the right to parent one's child is a fundamental right, the state has broad authority to intervene to protect a child from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. The award of permanent custody terminating parental rights is an "alternative of last resort and is only justified when it is necessary for the welfare of the children." (Citations omitted.) *In re L.B.,* 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 23.

{¶ 48} Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence,[3] that it is in the best interest of the child to grant permanent custody of the child to the agency" and that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) are applicable. Those circumstances include the following:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

---

[3] " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *L.B.* at ¶ 24, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

 R.C. 2151.414(B)(1)(a) through (e).

{¶ 49} If the juvenile court determines that one of the above circumstances applies to the case at issue, the court then looks to R.C. 2151.414(D) to resolve whether granting permanent custody is in the best interest of the child. As set forth in R.C. 2151.414(D)(1), the juvenile court, when determining the child's best interest, "shall consider all relevant factors, including, but not limited to, the following":

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[4]

---

[4] R.C. 2151.414(E)(7) through (11) include:
(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].
(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 50} As an initial matter, the parents do not challenge the trial court's finding that there was clear and convincing evidence that the children could not be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(B)(1)(a); (Apr. 8, 2021 Decision & Entry at 23). Accordingly, our review is limited to whether the juvenile court's conclusion that granting permanent custody to FCCS was in the best interest of the children was based on the manifest weight of the evidence. *L.B.* at ¶ 29, citing *L.W.* at ¶ 13.

### 1. Children's Interactions and Relationships (R.C. 2151.414(D)(1)(a))

{¶ 51} Pursuant to R.C. 2151.414(D)(1)(a), the first factor in determining whether a grant of permanent custody is in the children's best interest looks at the children's interactions and relationships with the parents, siblings, foster caregivers, and others. Both K.G. and P.S. argue that permanent custody should not be granted as the children are bonded with the parents and that the bond will be broken by granting permanent custody.

{¶ 52} Upon review, it is clear there is a bond between the parents and children. The testimony at trial indicated that both parents consistently visited the children. Vangeloff testified that H.S. is the most attached and initially requested to return to the care of her parents but has since changed her mind through the course of the proceeding. While the bond and relationship of the children to the parents is a factor, it is not controlling. " '[The] resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent.' " *B.B.* at ¶ 60, quoting *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. Vangeloff testified the children and parents have strong relationships and if the parents had overcome their drug addiction, she would have loved to reunify the parents with the children. Vangeloff based on her own observations or discussion with the caseworker believes the current placement of all the children is safe and appropriate. Damron testified that the children are all bonded with their current placement providers. Based on the

---

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

foregoing, as there is an identified bond between the children and caregivers and all the children, except R.S., live in potentially adoptive homes, the bond between the parents is less persuasive in this analysis.

{¶ 53} P.S. argues that the record is unclear that the placement of H.S. and A.S. with the paternal grandmother was secure for the foreseeable future or that it is likely to be a successful adoptive placement. (P.S.'s Brief at 43.) We disagree. Damron testified that A.S. and H.S. are placed with their paternal grandmother and are bonded with her in a prospective adoptive home. The paternal grandmother has been approved for placement, and they have lived with her since December 2020. When asked if the paternal grandmother is a foster to adopt home, Damron responded "it is." (Jan. 4, 2021 Tr. at 57.)

{¶ 54} P.S. argues that the placement with the maternal grandmother would be more appropriate. (P.S.'s Brief at 43.) We find this argument without merit. Damron testified that when the children first came into custody, they stayed with their maternal grandmother, and the parents left to stay with K.G.'s father. The grandmother requested the children be placed in foster care after one month. According to Damron, maternal grandmother has expressed no interest in custody of any of the children.

### 2. Children's Wishes (R.C. 2151.414(D)(1)(b))

{¶ 55} Next, we look at whether a grant of permanent custody is in the children's best interest requiring an examination of the wishes of the children, as stated by the children or through the guardian ad litem.

{¶ 56} Vangeloff testified that H.S. is old enough to understand the proceedings and wishes to be with her grandmother and permanent custody to be granted. Vangeloff testified that H.S. initially wanted to be reunified with her parents but has changed those wishes over the course of the permanent custody proceeding. Vangeloff stated that M.S. is six years old with autism, is non-verbal, and unable to express his wishes as to custody. A.S., R.S., and A.G. are all under four. Vangeloff testified that she believes A.S., R.S., and A.G. are too young to really grasp the nature of the custody proceeding. Of note, A.S. initially verbalized that she wanted to be with her parents but during the last meeting she stated that she did not know if she wanted to live with her parents anymore.

{¶ 57} P.S. argues that H.S. has consistently stated she wished to return to her parents, which led to the appointment of counsel for her in the case. The testimony of Vangeloff at trial, however, contradicts this point as Vangeloff explained that while H.S.

initially wanted to return to the care of her parents, as the case proceeded, that preference changed.  None of the children advocated for a return to the care of appellants.  Moreover, Vangeloff recommended that permanent custody be granted in this case based on appellants continued drug use, lack of participation in drug screens, lack of participation in Recovery Court, and lack of stable employment and housing.  (Feb. 2, 2021 Tr. at 29.)  Given the recommendation of the guardian ad litem and wishes of the children this factor favors the award of permanent custody.

### 3. Custodial History (R.C. 2151.414(D)(1)(c))

{¶ 58}  We next look at whether a grant of permanent custody is in the children's best interest considering their custodial history, including whether they have been in the temporary custody of the public service agency for 12 or more months of a consecutive 22-month period.

{¶ 59}  The children, except A.G., have been in the custody of FCCS since the ECO was granted on December 13, 2018.  A.G. was placed into the custody of FCCS on September 3, 2019.  The motion for permanent custody was filed on October 29, 2019.  As stated by the trial court "[a]t the filing of the Motion for Permanent Custody on October 29, 2019 [H.S.], [M.S.], [A.S.], and [R.S.] had been in agency custody (319 days) or 10 months 2 weeks and 5 days. The children have been in placement for more than 12 of a consecutive 22 months as per the statutory calculation noted above."  (Apr. 8, 2021 Decision at 14.)

### 4. Provision of a Legally Secure Permanent Placement (R.C. 2151.414(D)(1)(d))

{¶ 60}  The fourth factor in resolving whether a grant of permanent custody is in the children's best interest looks at the children's need for a legally secure placement and if that type of placement can be achieved without granting permanent custody to FCCS.  The trial court found that this factor favors granting permanent custody to FCCS.  Upon review, the evidence produced at trial supports such a conclusion.

{¶ 61}  Throughout this case, neither parent has demonstrated a consistent pattern of sobriety.  According to Damron, the case came to their attention when there was suspected drug use in the home.  It was reported that P.S. overdosed twice in November 2018.  P.S. admitted at trial to attempting suicide by drug overdose.  Damron also testified that drug paraphernalia was discovered in the room of M.S. while he was sleeping.  Moreover, neither parent has made any meaningful progress with their case plan.  K.G. has

had a case plan for two years that included taking an AOD assessment, completing Recovery Court, AOD treatment, follow all recommendations and perform random drug screens, obtain safe and stable housing free of illegal drugs, obtain stable income, meet with the caseworker every 30 days and make her home available to the caseworker, and visit regularly with her children.  Damron testified that K.G. has only completed the visitation objective of her case plan. K.G. testified to continued use of fentanyl and prior use of other drugs such as methamphetamine, cocaine, and opiates.  K.G. has received treatment from Grant Family Practice for Suboxone since December 2018 but has not consistently engaged with the program. K.G. also received treatment from Ohio Guidestone since October 2019 but was terminated from the program for noncompliance.  K.G. started inpatient treatment but left before completing the program against medical advice.  K.G. was also terminated from Recovery Court for noncompliance.  To date, K.G. has not completed an outpatient or inpatient treatment program for substance abuse.

{¶ 62}  K.G. testified that she was 27 or 28 weeks pregnant during the trial.  K.G. sees a specialist for maternal fetal medicine and has recently gone to all her baby appointments. K.G. used fentanyl during her last pregnancy with A.G. as she was not aware she was pregnant until 20 weeks.  K.G. testified that she used fentanyl between 10 to 15 times during her last pregnancy with A.G.  At trial, K.G.'s most recent use of fentanyl was 21 days before her testimony.  K.G. admits to using fentanyl each month from June through November 2020.  Vancleve could not recall the number of tests offered to K.G. but testified that she never had a negative test during her time in the program.  The tests were either missed or positive.

{¶ 63}  Similarly, P.S. has failed to meet his case plan, which is largely identical to K.G.'s with added objectives of diabetes and mental health treatment.  P.S. testified that he has had multiple drug overdoses and spent $10 per day on methamphetamine.  P.S. testified that his last use was over 90 days before the trial.  P.S. testified that he suffers from depression and attempted suicide in November 2018.  P.S. started inpatient treatment but left against medical advice.   P.S. was also terminated from Recovery Court for noncompliance.

{¶ 64}  Vancleve testified the parents' compliance with drug screens for Recovery Court as "very minimal."  (Dec. 2, 2020 Tr. at 21.)  The parents' attendance at office visits was characterized as hit or miss. Vancleve stated that neither parent demonstrated a

pattern of sobriety over this period.  Damron testified that the parents still live in the residence where the children were removed, and other people live in the home.  There have been no improvements to the living situation since the children were removed.  In fact, according to Damron, she witnessed K.G. with a syringe in her hair during one interaction at the residence at the start of the trial.

{¶ 65} P.S. argues that while there is evidence that some of his screens should be considered positive screens, it is unreasonable to conclude that every missed screen was positive since the COVID-19 pandemic was a major preclusion for testing as he is diabetic. (P.S.'s Brief at 40.)  This argument is unpersuasive.  Neither P.S. nor K.G. picked up their kits for the home screening process despite testimony that the parents knew the tests were available.  P.S. also conceded that he was not too concerned about his exposure to COVID-19 given his continued use of methamphetamine during this time.  K.G. contends that the parents can provide a stable home as they have lived at the same residence for years and plan to continue to do the same.  (K.G.'s Brief at 31.)  However, neither parent argued that they are ready for placement of the children.  No evidence was provided at trial that the house is now a safe, stable home secure and free from illegal drug activities or drug users. Moreover, K.G. has not worked in over five years purportedly because of M.S.'s medical condition. Even after the children were removed from the home, K.G. has not pursued employment.  Stable income is necessary to provide for the children.

{¶ 66} P.S. also argues while "[t]he FCCS attorney, the attorney for H.S., the GAL, and the witnesses made it clear that [P.S.] did not stop using, and thus could not successfully complete treatment * * * none of the attorneys or witnesses established through any factual proof or evidence that [P.S.] would harm his children because of his substance abuse." (P.S.'s Brief at 42.)  Appellant's argument misses the mark.  When this case began, P.S. testified he attempted suicide in November 2018 by using drugs.  Drug paraphernalia was found at the home and was within the access of the children.  P.S. was found overdosed leaving the children unsupervised.  P.S. admits the drug use and his drug addiction affects his mental health.  P.S. acknowledged that H.S., A.S., and R.S. are in counseling for PTSD arising from this case.  Similarly, K.G. conceded at trial that she believes she has a drug problem.  While K.G. testified that she has learned better coping mechanisms and how to handle triggers, she acknowledged that drug use impedes her ability to care for her children.

{¶ 67} K.G. argues that her drug problems never impacted her visits with the children as there were no "complaints about her behavior or parenting during those visits." (K.G.'s Brief at 31.) Damron described the visits as hectic but appropriate. The parents did show up late or leave early to go to the van. The potential for harm from the parents' inability to overcome their drug addiction was already evident with A.G. A.G. was born drug positive. K.G. admitted to using fentanyl 10 to 15 times during his pregnancy. While K.G. appears to be taking her current pregnancy more seriously, she admitted to taking fentanyl at least three times while pregnant. Damron testified that P.S. and K.G. have not successfully completed a drug or alcohol program since the case opened. Given these facts, the parents' previous and continued drug use pose a very real danger to the welfare and interests of the children.

{¶ 68} K.G. argues at least one child is in a non-adoptive placement, and the paternal grandmother in Georgia is only willing to adopt the two girls. "However, 'although "the likelihood that a child will be adopted may be considered in determining the child's best interest," the statutory provisions 'governing permanent custody simply do not require an agency to prove that adoption is likely." ' " *B.B.* at ¶ 68, quoting *K.R.* at ¶ 91, quoting *In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51. Based on the foregoing, there is a clear need for the children to have legally secure permanent placement, which cannot be achieved without a grant of permanent custody to FCCS.

### 5. Other Factors (R.C. 2151.414(D)(1)(e))

{¶ 69} Finally, the fifth factor in determining whether a grant of permanent custody is in the children's best interest looks at whether certain other statutory factors are applicable to the instant case. R.C. 2151.414(D)(1)(e). Here, the juvenile court found none of the factors in R.C. 2151.414(E)(7) to (11) are relevant. We agree and will not discuss these factors in our analysis.[5]

{¶ 70} Upon review of the evidence and testimony presented at the hearing before the juvenile court, we conclude there was competent, credible evidence to support the juvenile court's conclusion that granting permanent custody to FCCS was in the children's best interest. As such, we cannot find that the juvenile court's determination was against the manifest weight of the evidence. It is apparent from the record that K.G. and P.S. love their children. However, the children are in need of permanent placement and cannot wait

---

[5] The parties do not contend that the factors set forth in R.C. 2151.414(E)(7) to (11) are applicable.

any longer for their parents to comply with their case plan.  "The 'overriding concern' in any child custody case is to reach a disposition that is in the child's best interests."  *B.B.* at ¶ 69, citing *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist.1996).  As noted by the trial court "[p]arents say 'this time it's different', but unfortunately children can't be shelved in a capsule, * * * [t]ime does not stand still for these children who continue to grow, develop, and mature to functioning adults."  (Apr. 8, 2021 Decision & Entry at 20.)

{¶ 71}  For the foregoing reasons, the parents' assignments of error are overruled.

## V.  CONCLUSION

{¶ 72}  Having overruled both assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

KLATT and DORRIAN, JJ., concur.

_____