[Cite as *In re L.M.*, 2023-Ohio-4326.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | |
| In the Matter of: | | No. 21AP-580 |
| L.M. et al., | : | (C.P.C. No. 16JU-2089) |
| | | |
| (P.M., Mother, | : | No. 21AP-581 |
| | | (C.P.C. No. 16JU-2090) |
| Appellant). | : | |
| | | No. 21AP-582 |
| | : | (C.P.C. No. 17JU-15666) |
| | | |
| | : | (REGULAR CALENDAR) |
| | | |
| | : | |

D E C I S I O N

Rendered on November 30, 2023

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex* for appellant.

**On brief:** *Tyler W. Dunham* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1} Appellant, P.M., mother, appeals from the November 5, 2021 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and granting permanent custody of the minor children, L.M., A.P., and M.P. ("children") to appellee, Franklin County Children Services ("FCCS"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} P.M. is the mother to the three minor children at issue in this case: L.M. (d.o.b. 1/17/2014); A.P. (d.o.b. 4/20/2015); and M.P. (d.o.b. 9/30/2017).

{¶ 3}   On December 4, 2015, FCCS initiated cases 15JU-14363 and 15JU-14364 alleging minor children T.P., L.M., and A.P., were neglected, pursuant to R.C. 2151.03(A)(2), and dependent, pursuant to R.C. 2151.04(C), children.  On December 4, 2015, the juvenile court granted temporary custody of the children to FCCS until further order of the court.  The initial complaints were dismissed by operation of law after new complaints (16JU-2089 and 16JU-2090) were filed on February 18, 2016.  On February 22, 2016, FCCS was granted temporary orders of custody of the children.

{¶ 4}   On March 16, 2016, the cases proceeded to an adjudicatory hearing on the neglect and dependency causes of action.  The parties did not dispute an adjudication as to dependency.  The magistrate, without objection from counsel or the Guardian ad Litem ("GAL"), then dismissed the first cause of action.  The juvenile court issued temporary court commitments to FCCS as to L.M. and A.P., and protection supervision to FCCS as to T.P.  The father, J.P., was permitted temporary custody of T.P. until further order of the court.  On June 23, 2017, FCCS filed motions for permanent custody of L.M. and A.P. for purposes of adoption.  On July 12, 2017, FCCS filed a motion to terminate the court order of protective supervision as to T.P.  The matter was heard by the juvenile court on April 11, 2018.  At the conclusion of the hearing, the juvenile court granted FCCS' motion and terminated T.P.'s involvement in this matter.

{¶ 5}   On December 28, 2017, FCCS filed a new case involving minor child, M.P., alleging he was a dependent child, pursuant to R.C. 2151.04(C) and (D)(1)(2).  On January 2, 2018, the juvenile court held a hearing and granted temporary order of custody to FCCS.  On February 21, 2018, the juvenile court held an adjudicatory hearing, in which the parties did not contest that M.P. was a dependent minor child.  The juvenile court terminated the temporary order of custody and ordered temporary court custody to continue until further order of the court.  On March 9, 2018 and May 27, 2020, FCCS filed a motion for permanent custody of M.P.  The motions concerning M.P. were set to be heard with the prior motions for permanent custody for L.M. and A.P.  On June 1, 2021, the

juvenile court commenced a hearing on the outstanding motions for permanent custody of the children. The following evidence was adduced at the hearings.[1]

{¶ 6}  P.M. is the mother of the three children at issue in this case, L.M., A.P., and M.P. (June 1, 2021 Tr. at 54.)  None of the children have lived with her over the last five years. (Tr. at 58.)  According to P.M., the children do not live with her primarily because she has a guardian. (Tr. at 65.)  P.M. testified that she has had an Advocacy & Protective Services, Inc. ("APSI") guardian since she was 18 years old. (Tr. at 66.)  P.M. has attempted on several occasions to get the guardianship terminated but has been denied. (Tr. at 69-71.)

{¶ 7}  P.M. testified that she is familiar with her case plan. According to P.M., she was to complete parenting and domestic violence classes. (Tr. at 65.)  P.M. stated that she took parenting and domestic violence classes, but she does not know the exact date they were completed or what the location was called. (Tr. at 99, 101.)  According to P.M., the parenting course was for one month and met a total of four to five times. P.M. described the topics covered in the class, but she testified that she did not learn anything from the parenting classes as she already knew the information. (Tr. at 103.)  P.M. stated that she did not change her parenting at all from the classes because "[t]here was nothing to change." (Tr. at 103.)

{¶ 8}  P.M. is not employed, but she has worked at various times through a "temp agency." (Tr. at 105.)  According to P.M., she has worked a total of two to three months this year. (Tr. at 107.)  P.M. did not know how much money she has earned but estimates she has made approximately $900 dollars in 2021. (Tr. at 108.)  The longest period she has ever had one job was six months as a cleaner for Nationwide Arena. P.M. quit the job purportedly because of health concerns with her back. (Tr. at 108.) P.M. receives a monthly check of $1,500 from Social Security.  P.M. lives in a four-bedroom home with her boyfriend, Carlos, and his two teenage children. (Tr. at 110-11, 118.)  P.M. does not know Carlos' last name. (Tr. at 110.)  "I never asked.  But I can find out." (Tr. at 111.)  P.M. pays

---

[1] The permanent custody hearing continued on June 2, August 25, and August 26, 2021. The hearing also concerned the termination of the parental rights of the father, J.P. As the father has not filed an appeal in this matter, however, our recitation of the facts and analysis with focus on P.M.

$900 a month for rent and utilities. (Tr. at 112.) According to P.M., her home health aide provides transportation for groceries and medical appointments. (Tr. at 120.)

{¶ 9} P.M. testified that she cleans the house daily, but she conceded that people have helped her clean the house in the past. (Tr. at 129.) P.M. also acknowledged that FCCS has had concerns about the cleanliness of her home but stated "that's normal" when you have multiple children in your house. (Tr. at 129.) P.M. testified that J.P., the father of L.M. and A.P., resides with his mother and their daughter that is not at issue in this case, T.P. (Tr. at 126.) P.M. testified that J.P. takes adequate care of T.P. (Tr. at 132.) P.M. was told to stay away from T.P. and is not permitted to visit. (Tr. at 133.) P.M. resided with J.P. for a short period of time, but she was asked to leave. (Tr. at 137.) P.M. testified that on one occasion when J.P.'s mother tried to hit her child, she threatened the mother. "I would smack her back if she ever hit on my kid like that again." (Tr. at 135.)

{¶ 10} P.M. testified that she does not believe A.P. has any special needs or participates in therapy or counseling. (Tr. at 138.) P.M. said that A.P. does not have any prescription medications or behaviors that are hard to manage. (Tr. at 141.) P.M. last went to a medical appointment of A.P. about a year ago. (Tr. at 140.) According to P.M., she is permitted to go to medical appointments but the children are placed in Newark so it is difficult to attend. P.M. testified that L.M. has autism and ADHD and has been in a residential facility for several months. (Tr. at 143-44.) According to P.M., she has not seen L.M. in a year. (Tr. at 146.) P.M. has not spoken to any of his therapists. "I wasn't aware that he had a therapist." (Tr. at 150.) P.M. also does not know if L.M. is on any prescription medications. (Tr. at 151.) P.M. testified that M.P. does not have any special needs or medical problems. P.M. testified that she speaks to the foster parents on a daily basis. (Tr. at 152.)

{¶ 11} According to P.M., she "just started the visits up." (Tr. at 154.) Since restarting visitation, P.M. has attended one visit, one visit was canceled due to weather, and the other was canceled because she had a "family emergency." (Tr. at 156.) According to P.M., she had not been visiting the children because "in the past we had stuff comin' (sic) up and had stuff come up and this and that, and we had missed a couple." (Tr. at 157.) Because of the missed visits, P.M.'s visitation with the children was suspended. During the most recent visit, she let the children watch cartoons and took pictures. (Tr. at 158.) While

M.P. has been in foster care since birth, A.P. has been in foster care for approximately four and a half years. (Tr. at 162.) P.M. believes that the foster parents are "good people" and take "good care" of the children. (Tr. at 163.) P.M. testified that L.M. probably should not live with the other siblings and believes that "one of the other parents probably should have him." (Tr. at 165-66.) P.M., however, would still want all three children returned to her care. (Tr. at 167.) P.M. testified that because she does not work, she could take care of the kids all the time. (Tr. at 168.) "I don't have a job. I don't need one." (Tr. at 168.)

{¶ 12} According to P.M., she has had four to five different residences since 2016. (Tr. at 176.) P.M. stated that her current home has beds for all the children. (Tr. at 190.) P.M. testified that she has two dogs, a husky and a lab. (Tr. at 177.) While P.M. contests that her residence has ever been dirty with animal feces, she acknowledges FCCS has been concerned about the issue in the past. (Tr. at 178-79.) P.M. cannot see T.P. because of the "stuff that was lied on me * * * about." (Tr. at 180.) According to P.M., J.P.'s mother abused T.P., but she was blamed for it. (Tr. at 188.)

{¶ 13} J.P. testified that he is the biological father of T.P., A.P., and L.M. (Tr. at 194.) J.P. denies that he is the biological father of M.P., but he is listed as the father on the birth certificate. (Tr. at 194.) J.P. testified that he lives with his mother and daughter, T.P. The children at issue in this case, L.M., A.P., and M.P. have never lived with J.P.

{¶ 14} J.P. does not really know what the case plan entails. (Tr. at 196.) T.P. receives assistance from a service coordinator who helps with transportation. (Tr. at 197.) According to J.P., he took parenting classes a long time ago. (Tr. at 200-01.) J.P. has worked at the Home Depot warehouse for the last three years. (Tr. at 203.) J.P. earns $252 every two weeks after child support is removed from his paycheck. (Tr. at 204-05.) J.P. also receives $139 per month of food stamps. J.P. testified that his mother pays the entirety of the $790 monthly rent. (Tr. at 213.) J.P. acknowledged that he has an arrearage of over $3,000 on his water bill. J.P. was not sure how the arrearage accumulated. (Tr. at 211-12.)

{¶ 15} J.P. testified that T.P. was taken by FCCS in the summer of 2020. (Tr. at 231.) According to J.P., T.P. said that P.M. had hit her. (Tr. at 231.) J.P. has concerns that P.M. would hit T.P. if they were left alone. (Tr. at 234.) "She just might do it again and if she don't be watched." (Tr. at 234.) J.P. described another incident where P.M. knocked down his mother. (Tr. at 235.)

{¶ 16} J.P. testified that L.M. has autism. (Tr. at 251-54.) J.P. does not know if L.M. or A.P. are in counseling or on prescription medication. (Tr. at 256.) J.P. believes A.P.'s and M.P.'s foster parents are doing a good job. (Tr. at 258.) J.P. visited with A.P. and M.P. only once in 2021. (Tr. at 259.) J.P. stated that he was under the impression that he could not have custody of L.M. because L.M. would hurt the other children. (Tr. at 261.) According to J.P., it would not be a good idea for the children to be placed with P.M. (Tr. at 267.)

{¶ 17} Richard Furnish testified that he is an attorney and has been the GAL in this case since 2016. (Tr. at 274.) Furnish testified to his training and experience as a GAL. (Tr. at 274.) According to Furnish, he has stayed current in the case through updates from the various caseworkers, SARs, and, outside L.M.'s most recent placement, visiting with all the children in the foster homes. (Tr. at 275.) Furnish has had regular contact with the caregivers of the children and receives updates on their care. In 2019, Furnish supervised visitation on two occasions with P.M., father, and the minor children. (Tr. at 276.)

{¶ 18} Furnish explained that based on the special medical needs of the children and the parties, a case plan would not fix the underlying issues. (Tr. at 286.) Furnish testified that L.M. has microdeletion syndrome, autism, and ADHD. (Tr. at 286.) L.M. is currently placed in a residential facility in South Carolina. L.M. was placed in the residential facility for violent behavior, unsolicited anger, leaving the home without permission, general defiance of any kind of authority, and having to be physically restrained. (Tr. at 289.) Furnish believes that A.P. has some behavioral issues such as unprovoked aggression. (Tr. at 291.) Furnish testified the M.P. is too young to have a formal diagnosis at this point. (Tr. at 291.)

{¶ 19} Furnish testified as to concerns with P.M.'s parenting ability. Furnish stated that P.M. has had five addresses and has consistently allowed friends or family members to stay in her home. (Tr. at 295.) Furnish described P.M.'s previous issues regarding the care of animals, domestic violence, missed visitation, food shortage in the home, and her ability to make medical appointments. (Tr. at 296.) Furnish testified that based on his observations of P.M., he does not believe she is able to understand the children's issues. (Tr. at 297.) "I don't believe that she's able to fully comprehend the special needs that her children have, and to be able to meet those needs." (Tr. at 297.) By way of example, Furnish

noted one of the prior issues in this case concerned the cleanliness of the home with various cats and dogs and, upon his home visit, there were pets still in the home. (Tr. at 298.) Furnish noted that P.M. has a caseworker at the Board of Developmental Disabilities, and she is not her own legal guardian. (Tr. at 298.) Furnish testified that despite access to various services, he does not feel that P.M. is able to parent the children. (Tr. at 299.)

{¶ 20} Furnish last observed the parents interacting with the children in 2019. Furnish described the visit as "utter chaos." (Tr. at 301.) According to Furnish, the parents were not able to redirect the children. The children were running around, not listening, throwing things at each other, and displayed "general defiance." (Tr. at 302.) At one point, L.M. bit J.P. requiring him to physically restrain L.M. with his arms behind his back. (Tr. at 302.) During the visit, P.M. was consistently on her phone and would come and go out of the room. (Tr. at 303.) P.M. attempted to interact with the children but was unsuccessful. (Tr. at 303.) Furnish described concerns with P.M.'s home on his last visit in 2018. At that time, P.M. had a cousin or family member staying at the residence. (Tr. at 305.) Furnish did not report concerns about the cleanliness of the home. (Tr. at 306.)

{¶ 21} According to Furnish, L.M. is "not very verbal." (Tr. at 307.) Furnish does not believe L.M. is able to articulate his wishes regarding custody. (Tr. at 308.) Furnish also visited A.P. and M.P. in their foster placement. Furnish does not believe either A.P. or M.P. are able to understand what permanent custody would entail or express their wishes as to permanent custody. (Tr. at 309.) Furnish testified that the foster parents were open to becoming adoptive parents. Furnish has no concerns about the foster parents, and the children appeared comfortable in the home. (Tr. at 308.) Furnish concluded that it would be in all of the three children's best interests for permanent custody to be granted. (Tr. at 310.)

{¶ 22} On cross-examination, Furnish testified that the parents' visitation had been suspended at different points in the case based on the parents missing visits. (June 2, 2021 Tr. at 61.) Furnish noted that his concerns about transportation stem from missed visitation. "[I]f they can't make it to visitation, what's for me to think that they're gonna (sic) be able to make it to other things that are necessary, like medical appointments." (June 1, 2021 Tr. at 320.) According to Furnish, there has not been any change in the parental function over the life of the case. (June 2, 2021 Tr. at 59.)

{¶ 23} Elizabeth Blakley testified that she has been P.M.'s caseworker with FCCS for the last year and one half. (Tr. at 66.) Blakeley testified that part of her responsibilities is to assist the clients in executing the case plan by providing referrals to services or contact information for organizations. (Tr. at 69.) According to Blakely, when she was assigned to this matter, she familiarized herself with the family by speaking with the prior caseworker, reviewing the case summary and case logs, activity logs, and visiting with the family members. (Tr. at 70.)

{¶ 24} Blakely testified that FCCS became involved in this matter in 2014 after concerns that P.M. was unable to receive services based on the behavior of her roommate. The roommate had "explosive behaviors" and sent inappropriate text messages to P.M.'s in-home workers. (Tr. at 71.) At that time, P.M. was receiving six hours of daily in-home care from the Franklin County Board of Developmental Disabilities. (Tr. at 72.) There were also concerns over inadequate food, lack of diapers, and formula in the home for the children. (Tr. at 72.) According to Blakely, P.M. had to be prompted to clean the apartment and clean spit up off L.M.'s face. (Tr. at 72.) There was a subsequent report of P.M. leaving T.P. and L.M., a toddler and infant at the time, unsupervised in the home for 30-45 minutes. (Tr. at 73.) On July 11, 2014, T.P. had two bruises after returning from a visit with P.M. (Tr. at 73.) After P.M. engaged in a voluntary period with FCCS, L.M. and A.P. were removed in December 2015. According to Blakley, the children were removed after ongoing concerns that the children were "bruised, dirty, and hungry." (Tr. at 78.) Blakely also stated the home had a strong smell of urine and animal feces on the floor. (Tr. at 78.) M.P. was later removed on October 10, 2017. (Tr. at 76-77.) Blakely testified that P.M. is not her own guardian, and P.M. is not able to safely parent the children on her own. (Tr. at 77.)

{¶ 25} Blakely testified that L.M. and A.P. have been in the care of FCCS since December 5, 2015. (Tr. at 79.) M.P. has been in FCCS' continuous custody since October 10, 2017. (Tr. at 79-80.) Blakely testified that L.M. is diagnosed with microdeletion syndrome and autism. (Tr. at 81.) According to Blakely, L.M.'s prior placement was disrupted when his foster father reported that L.M.'s needs were too severe. Based on L.M.'s severe needs, FCCS was unable to find an in-state placement or foster family that would accept him. (Tr. at 80.) After emergency shelter care for two months, it was determined that L.M.'s needs were too significant for them to provide treatment. Pine

Grove in South Carolina, a residential facility, was able to accept him. Blakely testified that in the transporting process down to South Carolina, L.M. attempted to escape requiring police involvement, and L.M. bit and punched her and her supervisor. (Tr. at 82.) A.P. has remained in her foster placement since June 6, 2016. (Tr. at 92.) M.P. has been placed with the foster family since his birth. (Tr. at 93-94.)

{¶ 26} Blakely stated that the case plan was adopted by the court with the goal of reunification. (Tr. at 94.) Blakely has had monthly meetings with the parents and has gone over aspects of the case plan at each meeting. (Tr. at 95.) Blakely testified that she has been concerned that the parents did not understand the case plan. Regarding the case plan, Blakely testified that P.M. and J.P. were both asked to complete a psychological assessment and follow through with all recommendations, complete a domestic violence assessment and follow all recommendations, complete parenting classes, and provide stable housing and income sufficient to meet the needs of the children. (Tr. at 96-97.) Both P.M. and J.P. completed the psychological evaluation and are linked to services. P.M. completed the parenting program through Directions for Youth. (Tr. at 100.) Blakely still has concerns about P.M.'s parenting skills because she requires a legal guardian. "I would be very concerned about her ability to meet the needs of others as well as herself." (Tr. at 101.) P.M. has moved homes twice since Blakely has been assigned to the case, and FCCS has had ten different addresses during the life of the case. (Tr. at 103.) While Blakely does not have any concerns with the new residence, she acknowledged that she had not met Carlos. Blakely stated that P.M. has previously had friends or family members residing in the home who have not completed fingerprints or background checks through FCCS. (Tr. at 104.) Blakely did not have concerns about the adequacy of the food in the home.

{¶ 27} Blakely does not believe P.M. understands the full scope of the children's needs. Blakely noted that there was no specific plan for how P.M. would handle L.M.'s behavior with his siblings. According to Blakely, P.M. has been asked to leave residences over issues with the landlord and due to her home being in "deplorable" condition. (Tr. at 110.) Blakely stated that P.M.'s overall functioning has not changed since she took over the case. (Tr. at 110.) Blakely testified that A.P. is "relatively aggressive" but not as severe as L.M. (Tr. at 147.) A.P. has struggled with impulse control and behavior in school

concerning hitting other children. (Tr. at 147.) The foster parents have special training to cope with children who have behavior issues and additional counseling staff. (Tr. at 148.)

{¶ 28} According to Blakely, visitation has been available to the parents, outside a temporary suspension due to COVID-19 from March to June 2020, during the life of the case. Blakely testified that prior to March 2020, P.M. did not regularly attend visits. (Tr. at 157.) P.M. had her visits suspended on multiple occasions due to "no call, no shows." According to Blakely, from September 2019 to September 2020, P.M. missed 18 visits. (Tr. at 157-58.) When visits resumed in June 2020, P.M., after being informed that visits had returned, failed to appear, and did not call to cancel. (Tr. at 150.) In the summer of 2020, P.M.'s visitations were suspended after three no call, no shows. (Tr. at 152.) In March 2021, nearly a year after her visitations were suspended, P.M. requested visitation to resume. According to Blakely, P.M. went a year without seeing her children in person. (Tr. at 153.) P.M. attended one visit on May 15, 2021. (Tr. at 154.) On May 22, 2021, P.M. did not show up for her next visit and did not call Blakely to cancel. P.M. did notify the foster parents that she would not be able to make the visitation because "she was going to King's Island." (Tr. at 154.) FCCS canceled the next visit due to the weather. Regarding the May 15 visit, Blakely testified that P.M. was very engaged with the children and testified that there was a bond between P.M. and the children. (Tr. at 156.)

{¶ 29} Blakely testified that she has visited A.P. and M.P. with their foster parents two times per month. (Tr. at 174.) Blakely believes that the children are bonded with the foster parents. A.P. and M.P. call them "mommy" and "daddy," they spend time in the same area as the foster parents, and they go to the foster parents for comfort. (Tr. at 175.) Blakely believes that it would be "[e]xtremely" detrimental to separate A.P. and M.P. (Tr. at 177.) According to Blakely, the foster parents are interested in adoption. (Tr. at 177.) Blakely testified that the children are all in need of legally secure placement and would recommend that FCCS be granted permanent custody of the children. (Tr. at 178.)

{¶ 30} Melanie Domyan testified that she is the protective service representative supervisor for APSI. (Tr. at 181.) APSI is a statewide agency that provides services for adults with developmental disabilities. "[APSI] is considered probably for an individual with developmental disabilities * * * we're kinda (sic) the Agency to go to. We have a very fine history of training and so, we service individuals who have a very high need. These are

individuals that may have * * * non-compliance issues, they may have mental health issues." (Tr. at 194.) In 2009, APSI was referred to act as a protective services representative for P.M. (Tr. at 188.) Domyan has supervised P.M.'s case for approximately seven years. (Tr. at 190.)

{¶ 31} Domyan stated that P.M. has gone "AWOL" when there is a concern or incident, and she would just "take off and leave." (Tr. at 200-01.) Domyan went on to describe P.M.'s pattern of allowing people to stay in her home. (Tr. at 201.) Domyan testified that P.M. has had trouble maintaining her housing and described severe damage to one of her prior residences. (Tr. at 202.) Domyan described other instances where P.M. was asked to leave rental properties because of refusing to get rid of animals. (Tr. at 204-05.) Domyan testified that P.M.'s behavior has resulted in her living on the street for several months. (Tr. at 205.) P.M. is no longer eligible for a residential subsidy because of damage to two prior rental properties. (Tr. at 206.) P.M. has a social security payee and has not taken care of her own finances since she was 18 years old. (Tr. at 207-08.) According to Domyan, P.M. has attempted on multiple occasions to have her guardianship terminated. (Tr. at 210.) Domyan noted there have been 18 different status hearings since 2011. (Tr. at 210.) Domyan testified, "[i]t's just that non-compliance part of it that she has that -- that really rules her life sometimes. She has -- she wants to do the right thing for -- for herself and for her children, but she doesn't understand that when -- when the landlord says you can't have a dog, you can't have a dog." (Tr. at 212.) Domyan described an incident where a provider agency discovered an animal that had been locked in a cage for a week or more. (Tr at 213.) The animal was removed from P.M.'s care at that time. (Tr. at 214.)

{¶ 32} Jeannie Chai testified that she is a service coordinator at the Franklin County Board of Developmental Disabilities. (Aug. 25, 2021 Tr. at 56-57.) Chai testified as to the services her office provides J.P. and their interactions over the course of his case. (Tr. at 58-77.) Chai provided testimony as to issues concerning J.P.'s social security benefits, employment history, and current work at Home Depot. (Tr. at 119.)

{¶ 33} Julia Grant testified that she has worked as P.M.'s service coordinator with the Board of Developmental Disabilities for the last two years. (Tr. at 147.) According to Grant, P.M. requires "a lot of support" (Tr. at 150). P.M. has a payee and a homecare personal care plan, which is "staff to ensure she[] [is] safe in the community." (Tr. at 150.)

According to Grant, a staff member is in P.M.'s home for 12 hours per day. (Tr. at 151.) "[They] make sure [P.M. is] safe in her home, not getting into any police involvement risks, making sure she's going to her appointments, making sure she * * * has food." (Tr. at 151-52.) The staffer also helps with transportation, keeping a clean home, and grocery shopping. (Tr. at 152-53.) According to Grant, P.M. lives with an older woman, her boyfriend, and his two children. (Tr. at 154.) Grant testified that yesterday she received an email that P.M.'s boyfriend "rais[ed] a gun" to her and tried to assault her. (Tr. at 155.) Grant stated that the police became involved and the individual is no longer in the home. (Tr. at 155.) Grant testified that P.M. has been asked to leave three of her last four residences based on noncompliance with the lease for either having dogs, cleanliness, disputes with neighbors, or having various visitors. (Tr. at 158-60.) According to Grant, P.M. has refused assistance from staff at different points. (Tr. at 161.) Grant testified that P.M. has had several jobs but nothing permanent. (Tr. at 164.) P.M. has also had dogs removed based on neglect and abuse. (Tr. at 170.) Grant testified, "I feel like [P.M.] still needs assistance and guidance in mak[ing] the correct choices sometimes." (Tr. at 173.) Grant recalled an issue between P.M. and her payee when she bought tennis shoes but then did not have enough money for food. (Tr. at 176.) Grant tried to set P.M. up with a permanent job through Opportunities Ohioans for Disabilities, but she refused. (Tr. at 178.) Grant has also attempted to get P.M. enrolled in a day program to keep up her social interactions, but P.M. has refused to participate. (Tr. at 179.) Grant testified that P.M. has been involved in approximately six incidents with police involving assaults as either the victim or the perpetrator. (Tr. at 180.) Regarding changes to P.M.'s day-to-day case management, Grant testified that she has had to modify P.M.'s individual service plan to reduce staff because P.M. has been noncompliant. "[The] staff did not feel safe in some of the environments and some of the people that she had coming in the home." (Tr. at 182.)

{¶ 34} On cross-examination, Grant stated that P.M. has refused medication and counseling. (Tr. at 185, 210.) Grant testified the payee pays P.M.'s bills like utilities and rent, but P.M. pays her own cell phone. (Tr. at 193.) Grant testified the P.M. has previously refused to go on her visits with her children. (Tr. at 195.) Grant acknowledged that P.M. has not been criminally charged with anything since she has been on her case. (Tr. at 206.)

Grant conceded that P.M. has been able to find her own housing and find her own employment. (Tr. at 209.)

{¶ 35} Blakely was recalled to provide additional testimony in this case. (Aug. 26, 2021 Tr. at 8.)[2] Blakely testified that she discusses the case plan with P.M. and J.P. and does her best to alleviate any concerns or barriers. (Tr. at 14.) Blakely testified that A.P. has displayed aggressive behavior in the home as she has some impulse control issues. (Tr. at 51-52.) A.P. is in counseling and has begun ADHD medication. (Tr. at 52.) Blakely testified that P.M. has mental impairments that compromise her thought process. (Tr. at 62-63.) Blakely has made three unannounced attempts to visit P.M.'s home. (Tr. at 73.) The last time Blakely met with P.M. was in April 2021. (Tr. at 75.) The meeting "was on her porch as she was not comfortable with letting me into the home at that time." (Tr. at 74.) Later in the visit, Blakely was allowed to assess the initial living space, but she was not allowed to do a full walk-through. (Tr. at 75.) Blakely testified that she has not been able to do a background check on the individuals in the home to see if they are safe to be around the children. (Tr. at 76.) Blakely was not permitted to walk through P.M.'s home so she could not assess if the home was suitable. (Tr. at 95.)

{¶ 36} Blakely testified that P.M. has more services in the home than J.P. (Tr. at 79.) P.M. has completed a psychological evaluation and stayed connected with the Board of Developmental Disabilities. P.M. has also completed a domestic violence assessment and two parenting classes. (Tr. at 81, 83.) Blakely stated that while P.M. has substantially completed her case plan, she still would not recommend placement of the children with P.M. (Tr. at 85-86.) Blakely observed visitation on May 15, 2021, and she conceded that she did not see any concerns during that observation. (Tr. at 90.) Blakely also acknowledged that P.M. is committed to her children. (Tr. at 94.) At the conclusion of the hearing, the juvenile court took the matter under advisement.

{¶ 37} On November 5, 2021, the juvenile court awarded FCCS permanent custody of the children and divested P.M. and J.P. of their parental rights as to L.M., A.P., and M.P.

{¶ 38} P.M. filed a timely appeal in this matter.

---

[2] The juvenile court noted that P.M. was not present for the August 26, 2021 hearing. According to her attorney, she was ill and had intended to show up. Counsel said the communication with P.M. "was not clear." (Tr. at 4.)

## II. ASSIGNMENT OF ERROR

{¶ 39} P.M. submits the following assignment of error:

The trial court committed reversible error by terminating the appellant-mother's parental rights when the decision was against the manifest weight of the evidence.

## III. LEGAL ANALYSIS

### A. Appellant's Sole Assignment of Error

{¶ 40} In P.M.'s sole assignment of error, she alleges that the juvenile court's decision to terminate her parental rights was against the manifest weight of the evidence.

{¶ 41} The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution ensure an individual's right to parent one's child. *In re T.N.*, 10th Dist. No. 21AP-429, 2022-Ohio-2784, ¶ 45, citing *In re H.S.*, 10th Dist. No. 21AP-190, 2022-Ohio-506, ¶ 47, citing *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. The Supreme Court of Ohio has found that it is an essential and basic right of a parent to raise their own child. *In re B.H.*, 10th Dist. No. 22AP-670, 2023-Ohio-3491, ¶ 22, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 42} The right of a parent to raise their own child, however, is not absolute as a parent's natural rights are always subject to the ultimate welfare of the child. *B.H.* at ¶ 23, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40-41. "In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child." (Further citation omitted.) *In re K.R.*, 10th Dist. No. 22AP-51, 2023-Ohio-359, ¶ 11, citing *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10.

{¶ 43} Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant" the agency's motion for permanent custody of the child and that any one of the circumstances set forth

in R.C. 2151.414(B)(1)(a) through (e) are applicable.[3]  R.C. 2151.414(B)(1)(a) through (e) provides:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 44} If the juvenile court finds that any of the above circumstances are applicable, the court then must examine R.C. 2151.414(D)(1) to determine whether granting permanent custody is in the best interest of the child.  When resolving whether granting a motion for permanent custody is in the child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following":

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

---

[3] " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 24, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[4]

R.C. 2151.414(D)(1)(a) through (e).

{¶ 45} While a juvenile court is not obligated to specifically examine each R.C. 2151.414(D)(1) factor, it must make some indication on the record that all the factors were considered in its analysis. *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, ¶ 12, citing *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 53. Under the statute, no

---

[4] R.C. 2151.414(E)(7) through (11) provide additional factors such as:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or disability of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

single factor warrants more weight than the other factors.  *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 46} A juvenile court's determination that it is in the best interest of the children to grant a motion for permanent custody will not be reversed by a reviewing court absent a determination that the decision is against the manifest weight of the evidence.  *In re R.M.A.L.O.*, 10th Dist. No. 22AP-425, 2023-Ohio-3695, ¶ 40, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28.  " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.)  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).  When reviewing a juvenile court's judgment granting permanent custody to FCCS, an appellate court must make every reasonable presumption in favor of the judgment and the juvenile court's findings of fact.  (Citations omitted.)  *R.M.A.L.O.* at ¶ 40.  A juvenile court's grant of permanent custody is not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence.  *In re J.J.*, 10th Dist. No. 21AP-166, 2022-Ohio-907, ¶ 18, citing *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9.

### 1. R.C. 2151.414(B)(1)(a) through (e)

{¶ 47} Concerning, R.C. 2151.414(B)(1)(d), the juvenile court concluded that L.M. and A.P. were in the continuous custody of FCCS from December 4, 2015 to the date of filing of the motions for permanent custody, June 23, 2017.  (Nov. 5, 2021 Decision at 15, 23.)  The juvenile court determined this period exceeded 12 months of a consecutive 22-month period.  The juvenile court went on to note that M.P. was in the continuous custody of FCCS from October 10, 2017 to May 27, 2020, the date of the second motion for permanent custody, a period which also exceeded 12 months of a consecutive 22-month period.  P.M. does not dispute that the first part of the permanent custody analysis is met under R.C. 2151.414(B)(1)(d).[5]  Accordingly, we find that the statutory requirements of R.C. 2151.414(B)(1)(d) are satisfied, and we will focus our analysis on whether there was

---

[5] The juvenile court alternatively found that R.C. 2151.414(B)(1)(a) was satisfied because one or more R.C. 2151.414(E) factors were proven by clear and convincing evidence.

competent, credible evidence that the grant of permanent custody was in the best interest of the children. In reaching this determination, we review the juvenile court's findings of all relevant factors, including the five enumerated factors set forth in R.C. 2151.414(D)(1)(a) through (e).

### 2. Best Interest Analysis (R.C. 2151.414(D)(1)(a) through (e))

### a. Children's Interactions and Relationships (R.C. 2151.414(D)(1)(a))[6]

{¶ 48} Pursuant to R.C. 2151.414(D)(1)(a), the first factor in determining whether permanent custody is in the children's best interest requires the court to examine the children's interactions and relationships with the parents, siblings, foster caregivers, and others.

{¶ 49} The evidence in the form of testimony favors FCCS. Blakely testified as to P.M.'s lack of participation in visitation with the children. Blakely testified that prior to COVID-19, P.M. did not regularly attend visits and has had visitation suspended on multiple occasions. (June 2, 2021 Tr. at 157.)[7] According to Blakely, from September 2019 to September 2020, P.M. missed 18 visits. (Tr. at 157-58.) Grant was able to confirm that P.M. has previously refused to go on scheduled visits with her children. (Tr. at 195.) After visitation resumed, P.M. attended one visit on May 15, 2021. (Tr. at 154.) On May 22, 2021, P.M. did not show up for her visit and did not call Blakely to cancel. According to Blakely, P.M. did notify the foster parents that she would not be able to make the visitation because "she was going to King's Island." (Tr. at 154.) FCCS canceled the next visit due to the weather.

{¶ 50} Regarding the May 15 visit, Blakely acknowledged that P.M. was very engaged with the children and testified that there was a bond between the children and P.M. (Tr. at 156.) However, P.M. has had other visits that have not been nearly as successful. Furnish observed the parents interacting with the children in 2019. Furnish described the visit as "utter chaos." (June 1, 2021 Tr. at 301.) According to Furnish, the children were running around, not listening, throwing stuff at each other, and "general defiance." (Tr. at 302.)

---

[6] FCCS contends that P.M. failed to contest the juvenile court's findings under R.C. 2151.414(D)(2), and therefore, the juvenile court's judgment should be affirmed on that basis alone. However, we decline to address this argument as we find the juvenile court's analysis under R.C. 2151.414(D)(1) was not against the manifest weight of the evidence.

[7] Furnish also testified that the parents' visitation had been suspended at different points in the case based on the parents missing visitations. (Aug. 25, 2021 Tr. at 61.)

During the visit, P.M. was consistently on her phone and would come and go out of the room. (Tr. at 303.) P.M. attempted to interact with the children but was unsuccessful. (Tr. at 303.)

{¶ 51} Concerning the foster parents, Blakely has visited A.P. and M.P. in their foster home twice monthly. (Tr. at 174.) Blakely believes that the children are bonded with the foster parents. Blakely stated that A.P. and M.P. call them "mommy" and "daddy," they spend time in the same area as the foster parents, and they go to the foster parents for comfort. (Tr. at 175.) Blakely testified that it would be "[e]xtremely" detrimental to separate A.P. and M.P. (Tr. at 177.) According to Blakely, the foster parents are interested in adoption. (Tr. at 177.) Furnish also visited A.P. and M.P. in their foster placement and had no concerns as the children appeared comfortable in the foster home. (Tr. at 308.) P.M. acknowledged that the foster parents are "good people" and take good care of the children. (Tr. at 163.)

### b. Children's Wishes (R.C. 2151.414(D)(1)(b))

{¶ 52} Next, we consider the custodial wishes of the children. Furnish testified that he does not believe L.M. can articulate his wishes regarding custody as L.M. is "not very verbal." (Tr. at 307.) Furnish also does not believe either A.P. or M.P. are able to understand what permanent custody would entail or express their wishes as to permanent custody. (Tr. at 309.) Furnish concluded that it would be in all of the three children's best interests for permanent custody to be granted. (Tr. at 310.)

{¶ 53} P.M. argues that the GAL's testimony should have been discounted. "While performing many of the tasks required under the GAL rules, the GAL indicated he primarily relied on records he received during the discovery process. He had not contacted the appellant's legal guardian or any members of her Development Disabilities team. He had not contacted any teachers regarding the children's development nor had he obtained any academic records." (Appellant's Brief 23.) We are unpersuaded. The GAL's testimony was informed by his years of experience in this case and provided adequate basis to determine the children were not able to express their custodial wishes in this matter. The age of the children must also be considered. At the time of the hearing, L.M. was seven-years old, A.P. was six-years old, and M.P. was three-years old. Moreover, there was ample testimony as to the behavioral issues of L.M. and, while less severe, similar concerns with A.P. Multiple

witnesses testified that L.M.'s behavioral issues were so significant that he was moved to a residential facility in South Carolina. Given the age and behavioral concerns of the children, it is reasonable to conclude that they could not understand what permanent custody would mean or be able to directly express their wishes. (Tr. at 309.) In any case, nothing prevented P.M. from requesting an in-camera interview of the children to address their best wishes if they believed that they could have provided probative testimony on the subject.

### c. Custodial History (R.C. 2151.414(D)(1)(c))

{¶ 54} The third factor in determining the children's best interest is examining the children's custodial history. Here, the juvenile court extensively discussed the various placements of the children as well as the amount of time the children have been in the custody of FCCS. The juvenile court concluded the children have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). (Nov. 5, 2021 Decision at 25.) In P.M.'s brief, she effectively conceded that this factor favored FCCS. (*See* Appellant's Brief at 23-24) ("The children had been in FCCS custody for the requisite time periods.").

### d. The Children's Need for a Legally Secure Permanent Placement (R.C. 2151.414(D)(1)(d))

{¶ 55} The fourth factor considers the children's need for legally secure placement and whether the type of placement can be achieved without granting permanent custody to FCCS. The juvenile court found that the children were in desperate need of secure placement and that the evidence supports the agency's claim that a secure placement could not be achieved without granting permanent custody to FCCS. The juvenile court wrote that returning the children to the care of their parents "would create a significant risk to their health, that attempting to return [L.M.], [A.P.], and/or [M.P.] to either Parent would be unsuccessful and contrary to their best interest." (Nov. 5, 2021 Decision at 27.) The juvenile court concluded that there is "no doubt" that P.M. cannot meet the needs of the children and there was a need for the children to be in legally secure permanent placement. (Nov. 5, 2021 Decision at 26.)

{¶ 56} P.M. argues that while the stated goal was reunification, it appears that "was never going to happen." (Appellant's Brief at 26.) P.M. contends that she has substantially, if not fully, complied with the case plan.

{¶ 57} Upon review, we cannot say that the juvenile court's decision was not based on competent, credible evidence. While P.M. is correct that she complied with aspects of the case plan, the matter requires further examination. Blakely testified that P.M. was asked to complete a psychological assessment and follow through with all recommendations, complete a domestic violence assessment and follow recommendations, complete a parenting class, and provide stable housing and income sufficient to meet the needs of the children. (Tr. at 96-97.) P.M. completed the psychological evaluation and is linked to services. P.M. has also completed the parenting and domestic violence requirements of the case plan. However, as this court has stated, completion of some or all of the case plan is not a guarantee that parental rights will be restored. *In re B.R.*, 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 47, citing *In re E.B.*, 12th Dist. No. CA2009-10-139, 2010-Ohio-1122, ¶ 30; *See also In re Conn*, 10th Dist. No. 03AP-348, 2003-Ohio-5344, ¶ 19 ("Substantial completion of case plan requirements does not preclude a grant of permanent custody to a social services agency * * * we must consider whether the parent has substantially remedied the conditions that caused the child's removal."). Thus, the central focus becomes whether P.M. has substantially remedied the conditions that caused the children's removal and ability to meet the children's basic needs.

{¶ 58} Blakely testified that FCCS became involved in this case in 2014. After P.M. engaged in a voluntary period with FCCS, L.M. and A.P. were removed in December 2015. According to Blakley, the children were removed after ongoing concerns that they were "bruised, dirty, and hungry." (Tr. at 78.) Blakely stated the home had a strong smell of urine and animal feces on the floor. (Tr. at 78.)

{¶ 59} To be sure, a parent requiring the services of a guardian is not dispositive as to whether it would be in a child's best interest to grant FCCS permanent custody. In the case of P.M., however, her behavior during the course of this case supports the juvenile court's determination. Blakely explained that one of the goals is to provide the basic needs of the children, and Blakely did not necessarily see that P.M. could meet this objective. (Tr. at 96.) "I would be very concerned about her ability to meet the needs of others as well as herself." (Tr. at 101.) Blakely stated that she does not believe P.M. grasps the full scope of the children's needs. Blakely testified that there was also no identifiable plan as to how she would handle L.M.'s behavior with his siblings and that P.M.'s overall functioning has not

changed since she took over the case. (Tr. at 110.) Furnish provided similar testimony as to P.M.'s capacity to parent these children. Furnish testified that based on his observations of P.M., he does not believe she is able to understand the children's issues. (Tr. at 297.) "I don't believe that she's able to fully comprehend the special needs that her children have, and to be able to meet those needs." (Tr. at 297.) Blakely's assessment is bolstered by P.M.'s testimony at the hearing. P.M. continually understated the major undertaking of parenting three children and was dismissive of her prior shortcomings when caring for her children. P.M. stated that she did not change her parenting at all from the classes because "[t]here was nothing to change." (Tr. at 103.)

{¶ 60} P.M. has also refused efforts to maintain full-time employment. Grant testified that she had tried to set P.M. up with a permanent job from Opportunities Ohioans for Disabilities, but she refused. (Tr. at 178.) Grant has also tried to get P.M. enrolled in a day program to keep up her social interactions, but she has refused to participate. (Tr. at 179.) According to P.M., she has worked a total of two to three months and estimates that she has made around $900 dollars in 2021. (Tr. at 108.) P.M. gets a monthly check from Social Security of $1,500. P.M. testified that because she does not work, she could take care of the kids all the time. (Tr. at 168.) "I don't have a job. I don't need one." (Tr. at 168.)

{¶ 61} Moreover, despite P.M.'s prior issues with caring for her animals, P.M. testified that she has two dogs, a husky and a lab, in her care. (Tr. at 177.) As explained by Domyan, "[i]t's just that non-compliance part of it that she has that -- that really rules her life sometimes. She has -- she wants to do the right thing for -- for herself and for her children, but she doesn't understand that when -- when the landlord says you can't have a dog, you can't have a dog." (Tr. at 212.) At the hearing, while P.M. conceded that there have been concerns about the cleanliness of her house, but she believes "that's normal" when you have multiple children in your house. (Tr. at 129.) While the removal of animals was not part of the case plan, P.M.'s insistence on keeping animals in the home goes to P.M.'s efforts to remedy the prior issues that led to the initial removal.

{¶ 62} There was also substantial testimony as to P.M.'s difficulty in maintaining stable housing. Furnish testified that P.M. had five addresses and has consistently allowed friends or family members to stay in her home. (Tr. at 295.) Blakely stated that P.M. has moved twice since Blakely has been assigned to the case, and they have ten different

addresses during the life of the case. (Tr. at 103.) Domyan described instances where P.M. was asked to leave multiple rental properties because of repeated refusals to get rid of animals. (Tr. at 204-05.) Similarly, Grant testified that P.M. has been asked to leave three of her last four residences based on noncompliance with the lease for either having dogs, cleanliness, an altercation with neighbors, or having various visitors. (Tr. at 158-60.) Domyan testified these issues with the various rental properties resulted in P.M. living on the street for several months. (Tr. at 205.) According to Domyan, P.M. is no longer eligible for a residential subsidy because of damage to two prior rental properties. (Tr. at 206.) Similarly, Domyan stated that P.M. would go "AWOL" when there was a concern or incident, and she would just "take off and leave." (Tr. at 200-01.)

{¶ 63} Regarding P.M.'s current residence, while there was testimony that the size of the home was suitable for the children, there were concerns as to whether it was appropriate to bring the children into the home. During Blakely's most recent visit, she met with P.M. "on her porch as she was not comfortable with letting me into the home at that time." (Tr. at 74.) According to Blakely, she was not able to determine whether the home was suitable based on her inability to walk through the residence. (Tr. at 95.)

{¶ 64} P.M. has repeatedly allowed other people to stay in her home. Blakely noted that during the life of the case, there have been friends or family members residing in the home who have not provided fingerprints or background checks through FCCS. (Tr. at 104.) Throughout the hearing, this issue was most prevalent concerning P.M.'s boyfriend, Carlos. During P.M.'s testimony, she acknowledged that she did not know Carlos' last name. (Tr. at 110.) "I never asked. But I can find out." (Tr. at 111.) During the first part of the hearing conducted in June, Blakely and Furnish testified that they had concerns about Carlos as they did not know anything about him. (Tr. at 296.) This initial concern was validated when the case resumed in August. Grant testified that she received an email that the boyfriend "rais[ed] a gun" and tried to assault P.M. (Tr. at 155.) Grant stated that the police became involved, and the individual was no longer in the residence. (Tr. at 155.) While the boyfriend appears to be out of the home, the incident confirmed many of the prior concerns over P.M.'s pattern of allowing individuals in the home without being properly vetted.

{¶ 65} Again, while an individual who requires a guardian is not necessarily unable to successfully parent a child, the level of care and support that P.M. requires must be considered. Domyan testified that P.M. has a social security payee, and she has not taken care of her own finances since she was 18 years old. (Tr. at 207-08.) According to Grant, P.M. requires "a lot of support" (Tr. at 150). P.M. has a payee and a homecare personal care plan, which is "staff to ensure she[] [is] safe in the community." (Tr. at 150.) Grant testified as to an issue between P.M. and her payee when she bought tennis shoes but then did not have enough money for food. (Tr. at 176.) The staff member is in the home for 12 hours per day. (Tr. at 151.) "[They] make sure she's safe in her home, not getting into any police involvement risks, making sure she's going to her appointments, making sure she * * * has food." (Tr. at 151-52.) Grant testified, "I feel like [P.M.] still needs assistance and guidance in mak[ing] the correct choices sometimes." (Tr. at 173.) P.M. had a recent reduction in her staff because "[P.M.'s] staff did not feel safe in some of the environments and some of the people that she had coming in the home." (Tr. at 182.) Despite the significant amount of support already provided, P.M. has refused support in other areas that the service providers deemed appropriate. By way of example, Grant stated that P.M. has refused counseling and medication. (Tr. at 186, 210.)

{¶ 66} There was also substantial testimony as to the significant behavioral needs of the children in this case. Furnish testified that L.M. has microdeletion syndrome, autism, and ADHD. (Tr. at 286.) L.M. is currently placed in South Carolina in a residential facility for violent behavior, unsolicited anger, leaving the home without permission, general defiance of any kind of authority, and having to be physically restrained. (Tr. at 289.) Blakely testified that while transporting L.M. to South Carolina, L.M. attempted to escape requiring police involvement. (Tr. at 82.) Both Furnish and Blakely testified A.P. exhibits behavioral issues such as unprovoked aggression and impulse control issues. (Tr. at 51-52.) A.P. is in counseling and has begun ADHD medication. (Tr. at 52.) Furnish testified the M.P. is too young to have a formal diagnosis at this point. (Tr. at 291.) The foster parents are uniquely qualified to handle these issues as they have special training to deal with children who have behavior issues and additional counseling staff. (Tr. at 148.) Given the behavior needs at play, the children are in need of legally secure permanent placement.

**e. Whether any of the factors in divisions (E)(7) to (E)(11) apply in relation to the parents and child (R.C. 2151.414(D)(1)(e))**

{¶ 67} Finally, we look at whether any of the factors provided in divisions (E)(7) to (E)(11) are applicable. The juvenile court found that no evidence was offered as to these factors. (Nov. 5, 2021 Decision at 27.) P.M. does not contest the juvenile court's finding as to this factor. (Appellant's Brief at 26.)

**f. Conclusion of Best Interest Analysis**

{¶ 68} In sum, the record demonstrates that the juvenile court properly reviewed and weighed the evidence regarding all the factors relevant to determining whether a grant of permanent custody to FCCS was in the children's best interest. After careful review of the evidence and testimony presented at the hearing, there was competent, credible evidence to support the juvenile court's conclusion that terminating P.M.'s parental rights was in the children's best interest. "The 'overriding concern' in any child custody case is to reach a disposition that is in the child's best interests." *In re B.B.*, 10th Dist. No. 20AP-488, 2021-Ohio-2299, ¶ 69, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist.1996). Accordingly, we cannot find that the juvenile court's determination was against the manifest weight of the evidence.

{¶ 69} For the forgoing reasons, P.M.'s sole assignment of error is overruled.

## IV. CONCLUSION

{¶ 70} Having overruled P.M.'s sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, as to the termination of her parental rights and permanently divesting her of any and all parental rights, privileges, and obligations.

*Judgments affirmed.*

BEATTY BLUNT, P.J. and JAMISON, J. concur.

————————————